# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA

Plaintiff,

v.

ROBERT DONALD GORDON

Defendant.

Case No. 17-20636
Hon. Terrence G. Berg

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 14)

## I.   Introduction

This case presents the question of whether police violate the Fourth Amendment when they enter and search a hotel room without a warrant based on information that a consenting-age female teenager is in the hotel room with an older man.

On August 27, 2017, officers from the Southfield Police Department ("SPD") entered Defendant's hotel room in responding to a report that a 16-year-old girl ("MV-1 [Minor Victim-1]") was in the room with Defendant, a 45-year-old man. The officers knocked on the door several times, but no one answered. Using a key provided to them by the hotel's front desk clerk, the officers entered the room. They found the Defendant and MV-1 inside and seized electronic devices containing evidence of child pornography that now forms the basis for the underlying charges in this

action. Defendant moves to suppress the evidence and the government opposes the motion. For the reasons outlined below, Defendant's motion is **GRANTED**.

## II.    Background

At around 3:00 a.m. in the morning on August 27, 2016, parents of 16-year-old "MV-1" called 911 to inform officers that they received information their daughter was at the Marvin's Garden Inn in Southfield, Michigan. ("Marvin's Garden" or "the hotel"). Although MV-1 had told her parents that she would be spending the night at a friend's house, the parents told police that their daughter had posted a social media message indicating she was actually at the hotel with a 45-to-50 year old man from Indiana named "Robert." Dkt. 14, Pg. ID 32.[1] MV-1's parents had never heard of "Robert" and did not know who he was. According to the government, Marvin's Garden Inn is a hotel "well-known to the officers for sex trafficking, drugs, and violence." Dkt. 17, Pg. ID 62.

---

[1] A family member reported to the parents that MV-1 had posted information on her "Snapchat" account that she was with "Robert"—an older white man—at the motel. Snapchat is a social media messaging application, which allows users to create multimedia messages, such as a photograph or a short video, and edit that multimedia to include text captions and other effects. Users are allowed to share that multimedia, called "snaps," to a private or semi-public group of other users. The primary concept behind the application is the capturing of moments: the multimedia created by users are only available for a short time before they become inaccessible.

Four Southfield Police Officers met MV-1's parents in the hotel parking lot. Dkt. 14, Pg. ID 41; Dkt. 17, Pg. ID 62, 64. Believing MV-1 was with an unknown older man from Indiana, police officers observed an orange Chevrolet HHR that was parked in the hotel parking lot, which had an Indiana license plate. After running the license plate in their database, the officers learned that the vehicle belonged to the Defendant, Robert Donald Gordon—a white, 45-year-old male from Logansport, Indiana. Dkt. 17, Pg. ID 64. Based on that information, the officers talked to the hotel clerk and learned that Gordon had checked into room #103 earlier that afternoon.

Using their steel batons, Officers knocked on the door for "five to ten minutes" but no one answered. Dkt. 17, Pg. ID 64; *see* Dkt. 14, Pg. ID 41. The officers did not knock quietly, but loudly struck the hotel room's steel front door and the room's glass window with their batons. *See* Dkt. 17, Pg. ID 64. They yelled "Southfield Police" and "Open the door."

Getting no answer, the officers went back to the front desk, asked for a room key, and waited for the arrival of their Sergeant. After the Sergeant arrived, they returned to the room and again used their batons to pound on the door while they announced "Police," and "Open the door" for a few minutes. When no one answered, they used the key to enter Defendant's room. The officers encountered Defendant sitting on the bed. In response to the officers' questioning, Defendant informed the officers that MV-1 was in the bathroom. Dkt. 14, Pg. ID 42. The officers found

and escorted MV-1 out of Defendant's hotel room. *Id; see also* Dkt. 17, Pg. ID 65. As the officers escorted MV-1 out of the room, MV-1 asked one of the officers to retrieve her boots, as she was barefoot. While kneeling down beside the bed with his flashlight, one of the officers noticed a photograph sticking out of MV-1's bag, showing her posing naked with Defendant, who was also nude.

While the officers did not arrest Defendant at that time, they did provide him with *Miranda* warnings. Dkt. 17, Pg. ID 65. Defendant told SPD that he wanted to "cooperate 100 percent." *Id.* He allegedly gave law enforcement permission to search the room and all of his belongings. *Id.* As a result of the search of the room, the officers seized a number of items including a pink and white Samsung phone, a black Samsung phone, a Sony video camera, an iPad tablet, and 3 photographs of MV-1 and the Defendant. Dkt. 14, Pg. ID 42. Defendant provided the passcode to his phone and admitted that the electronic devices probably had naked pictures of MV-1 that she sent to him. Dkt. 17, Pg. ID 66. Officers took the devices and obtained a search warrant the following day. *Id.* As a result of the search of Defendant's devices, police found several videos of MV-1 and Defendant engaged in sexual acts. *Id.*

Defendant was later arrested and charged in a seven-count indictment alleging four counts of production of child pornography, one count of coercion and enticement of a minor, one count of interstate travel with

the intent to engage in a sexual act with a minor, and one count of possession of child pornography. *See* Dkt. 14, Pg. ID 37. Defendant subsequently filed this motion to suppress, challenging the officers' entry and subsequent search of his hotel room and electronic devices, which Defendant argues violated his Fourth Amendment rights. *See id.*

## III.  Standard of Review

### A.  <u>Exigent Circumstances Doctrine</u>

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause . . . describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home." *Payton v. New York,* 445 U.S. 573, 585 (1980). It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 at 586 (1980). The Fourth Amendment's full complement of protections also applies to hotel rooms. *See United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (citing *Hoffa v. United States,* 385 U.S. 293, 301 (1966)).

Because the physical entry of the home is the chief evil against which the Fourth Amendment is concerned, a search of a residence or a hotel room conducted without a warrant is per se unreasonable unless

the police can show that the search falls within one the carefully defined exceptions to the warrant requirement. *See United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2005). Exigent circumstances are among the few "well-defined" and "carefully circumscribed" exceptions to the warrant requirement. *See United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). The government bears a "heavy burden" of proving exigency. *McClain*, 444 F.3d at 562 (6th Cir. 2005) (internal citations omitted).

In general, exigent circumstances exist when "'real immediate and serious consequences' will 'certainly occur' if a police officer postpones action to obtain a warrant." *Williams*, 354 F.3d at 503 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)). The Sixth Circuit has identified the emergency situations giving rise to the exigent circumstances exception requirement as: 1) hot pursuit of a fleeing felon, 2) imminent destruction of evidence, 3) the need to prevent a suspect's escape, or 4) a risk of danger to the police or others. *Williams*, 354 F.3d at 503 (citing *United Sates v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994)). In addition to these four categories, the Sixth Circuit has separately recognized as an exigent circumstance a situation in which there is an "ongoing and highly intrusive breach of a neighborhood's peace in the middle of the night." *United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996). Finally, the Supreme Court has also found that law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant

or to protect an occupant from imminent injury without violating the Fourth Amendment. *See Brigham City v. Stuart*, 547 U.S. 398, 403-04 (2006).

### B. <u>Community Caretaking Doctrine</u>

The "community caretaking" function of police is also recognized as an exception to the warrant requirement for some types of searches. In *Cady v. Dombrowski*, 412 U.S. 433 (1973), the Supreme Court found a warrantless search of a vehicle trunk to be reasonable where 1) the search was of an automobile, in which there is a lesser expectation of privacy than a home; 2) the police were exercising their "community care-taking function" in a matter "totally divorced from the detection, investi-gation, or acquisition of evidence relating to the violation of a criminal statute," *id.* at 441; and 3) the police were responding to an immediate concern for the safety of the general public, which was endangered by the possibility that an intruder might remove a revolver that was believed to be in the trunk of the car.

The Sixth Circuit has also recognized the community caretaking exception. *See Williams*, 354 F.3d at 508 ("[T]he community caretaking function of the police applies only to actions that are totally divorced from the detection, investigation, or acquisition of evidence relating to the vi-olation of a criminal statute."). The community caretaking function artic-ulated in *Cady* has most often been applied to the warrantless searches of automobiles. *See Taylor v. Michigan Dept. of Natural Resources*, 502

F.3d 452, 462 (6th Cir. 2007) (Aldrich, J., dissenting) (citing cases). The Supreme Court has never applied the community caretaking doctrine to allow the warrantless search of a home. Likewise, those circuit courts of appeal considering the question have either expressly disallowed the community caretaking exception in the context of home searches[2] or have only allowed such searches under a traditional or modified exigent circumstances analysis.[3]

---

[2] The Seventh, Ninth, Tenth, and Eleventh Circuits have declined to extend the community caretaking doctrine as a justification for a warrantless home search. *United States v. Pichany,* 687 F.2d 204, 207–09 (7th Cir. 1982); *United States v. Erickson,* 991 F.2d 529, 531 (9th Cir. 1993); *United States v. Bute,* 43 F.3d 531, 535 (10th Cir. 1994).

The Eleventh Circuit, in *United States v. McGough,* 412 F.3d 1232, 1238–39 (11th Cir. 2005), noted that it has "never explicitly held that the community caretaking functions of a police officer permit the warrantless entry into a home." The court went on to find that, in any event, the facts did not warrant application of the exception in that case.

The Third Circuit has more recently joined the approach followed by the above circuits. *See Ray v. Township of Warren*, 626 F.3d 170, 177 (3d Cir. 2010) ("We agree with the conclusion of the Seventh, Ninth, and Tenth Circuits . . . and interpret the Supreme Court's decision in *Cady* as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes. The community caretaking doctrine cannot be used to justify warrantless searches of a home.").

[3] *See United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention."); *United States v. Rohrig*, 98 F.3d 1506, 1521–22 (6th Cir. 1996) (addressed in more detail below).

## IV. Analysis

Defendant points out that the officers had neither a warrant nor his consent to enter and search his hotel room. He argues that the officers had no reason to believe a crime was being committed in the hotel room or that any person inside the room was in danger. "Even if the officers believed the two were having consensual sex," Defendant contends, "that act does not constitute a crime [because] Michigan's criminal sexual conduct statute establishes the age of consent at 16." Dkt. 14, Pg. ID 38 (citing Mich. Comp. Laws § 750.520b). After entering his hotel room, Defendant states the officers "made numerous observations, obtained statements, and seized a number of electronic devices and photographs. The officers subsequently obtained a search warrant and searched the electronic devices locating a number of videos that reportedly constituted child pornography." Dkt. 14, Pg. ID 38. Defendant contends that this evidence should be suppressed as fruit of the illegal entry and search of his room, pursuant to the exclusionary rule. Dkt. 14, Pg. ID 38, 40 (citing

---

While some cases state that the Fifth Circuit has endorsed a community caretaker exception to justify the warrantless search of a home, citing to *United States v. York,* 895, F.2d 1026 (5th Cir. 1990), a closer reading of the case suggests that the holding is more narrow: the court found that no search took place for purposes of the Fourth Amendment analysis. *Id.* at 1029-30. It is not clear that governing law in the Fifth Circuit extends *Cady* to homes.

*Wong Sun v. United States,* 371 U.S. 471, 484 (1963) and *Segura v. United States,* 468 U.S. 796, 804 (1984)).

The government recognizes that this case involves the warrantless entry and search of a space protected by the Fourth Amendment. Even so, the government argues that the conduct was justified under two exceptions to the warrant requirement. Moreover, even if the conduct did not fall within either exception and were found in violation of the Fourth Amendment, the government argues that the Court should not apply the exclusionary rule in this context.

### A. <u>Was the Warrantless Entry Justified Under the Exigent Circumstances Exception?</u>

As stated above, our law recognizes an exception to the warrant requirement that permits the entry and search of a residence in response to exigent circumstances. Such exigent situations include: (1) hot pursuit of a fleeing suspect; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; (4) danger to the police or to the public; and (5) the need to assist persons who are seriously injured or threatened with such injury. *See, e.g., Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010). The government only argues that the fifth exigency, also framed as the "emergency aid" exigency, applies here; thus, the Court will only address the fifth exigency.

The Supreme Court recognized the fifth exigency to the warrant requirement in *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). In

*Brigham City,* police officers responded to a noise complaint in the early hours of the morning, and when they approached the house, they could hear a fight or altercation taking place inside. *Id.* at 401. The officers saw minors drinking outside the residence, heard shouting coming from inside, and then saw four adults attempting to restrain a juvenile. *Id*. They then observed the juvenile punch one of the adults in the face, and saw the victim "spitting blood into a nearby sink." *Id.* "The other adults continued to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across the floor." *Id.* The police entered the home and subsequently arrested one of the adults present for contributing to the delinquency of a minor, disorderly conduct and intoxication.

The Supreme Court found it "plainly reasonable" for the officers to enter the house and quell the violence, for they had an "objectively reasonable basis for believing that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* In so holding, the Court reiterated its view that the subjective motivation of the officers in entering the home is irrelevant and held that police action is reasonable "regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Id.* at 405 (internal citations omitted) (emphasis in original). The governing principle from

*Brigham City* is clear: "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. at 403.

The government also points to *Michigan v. Fisher*, 558 U.S. 45 (2009) to support the application of the emergency aid exigency in this case. In *Fisher*, police responded to a report of a man "going crazy" and when they approached the house, they observed "a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fence posts along the side of the property, and three broken house windows, the glass still on the ground outside. *Id*. at 45-46. Inside the house, officers could see Fisher "screaming and throwing things" and could see that he had a cut on his hand. *Id*. The Supreme Court held that an exigency existed: "[i]t would be objectively reasonable to believe that [the defendant's] projectiles might have a human target (perhaps a spouse or a child), or that [the defendant] would hurt himself in the course of his rage." *Id*. at 549.

In both *Brigham City* and *Fisher*, the Court found that the officers: 1) responded to a report of a disturbance, 2) encountered a tumultuous situation at the scene, and 3) observed "violent behavior inside" that appeared to create an imminent risk of harm to the subject or others. These factors supported a "straightforward application of the emergency aid exception" in both cases. *See Fisher*, 558 U.S. at 48.

Here, the government argues that the circumstances in this case, when viewed objectively, provide a reasonable basis to believe that MV-1 needed emergency assistance. According to the government, SPD was responding to a "threat of danger, and the safety of a child"—a situation that required "immediate government action." Dkt. 17, Pg. ID 70. The government highlights the fact that MV-1's parents called 911 and that the "police knew 'Robert' had taken MV-1, without parental permission, to this motel." Dkt. 17, Pg. ID 77. In its brief, the government further argues:

> Particularly when [Defendant] refused to answer the door, and officers heard rustling inside, they had an even greater concern that: (1) this child was in immediate danger; (2) Defendant may be destroying any type of evidence of criminal activity; or (3) Defendant may be planning an escape. The last thing officers would be expected to do in this situation is walk away shrugging their shoulders because no one answered the door.

Dkt. 17, Pg. ID 77.

Unfortunately for this argument, the testimony at the suppression hearing did not corroborate the government's claims regarding the sound of rustling, or any other sounds or sights suggesting destruction of evidence, escape of the suspect, or immediate danger to MV-1. Officer Christopher Clark and Sergeant Peter Simerley—two SPD officers who responded to the hotel on the night in question—testified that they did not hear anything from inside the room when they knocked on the door. When asked by the government "when you were knocking on the door

and announcing that the [SPD] were there did you hear anything inside the room?" Officer Clark testified, "No, I did not." On cross examination, Officer Clark testified that he heard "nothing whatsoever" when knocking on defendant's hotel room door for about five minutes. Similarly, Sergeant Simerley was asked on cross examination, "But with the knocking and the yelling '[SPD]' you heard no movement in that room, right?" he stated, "I did not, no."

When questioned what evidence showed that anyone was in danger, Sergeant Simerley stated, "Well, I believe the silence, the lack of occupants not responding to our knocks at the door, for me was – at least lent potential to something may have happened in the room, yes, sir." When Officer Clark was asked to justify why he was primarily concerned with the well-being of MV-1, he responded, "Because [MV-1's] parents were deathly afraid of what could happen to her and we just – we don't know, you know. She's a juvenile with another – with an older individual that the parents don't know about and they were scared for her safety."

The government also argues that the Marvin's Garden Inn is a "seedy motel" that is "widely known to host drug activity and commercial sex trafficking activity." Dkt. 17, Pg. IDs 72, 77. Officer Clark testified that Marvin's Garden was not a nice hotel and that he had been dispatched there before for "prostitution, domestics, loud noise, loud parties, [and] evictions." Similarly, Sergeant Simerley, when asked about the

kinds of calls he had answered at the hotel, responded, "Drug, prostitu-
tion, crimes of violence are the typical." The government points to these
characteristics to bolster its argument that exigent circumstances justi-
fied the officers' warrantless entry into Defendant's hotel room based on
a "need to assist persons who are seriously injured or threatened with
such injury" according to *Brigham City* and its progeny.

To summarize, the government contends that the following evi-
dence presented at the hearing is sufficient to establish exigent circum-
stances:

- The SPD officers were aware that Marvin's Garden Inn had
  prior reports of sex trafficking, drug trafficking, domestic
  disturbances, and violence.

- The officers knocked loudly, using their steel batons, in two
  separate attempts to get someone to open the hotel room
  door, but no one answered.

- The parents of MV-1 did not know for certain where MV-1
  was, did not know who Robert—the 45-year-old man from
  Indiana—was, and were extremely concerned for their
  daughter's safety.

- The officers wished to conduct a "welfare check" to investi-
  gate whether MV-1 was in the room and whether she was
  safe.

In response to this evidence, Defendant points to the following facts
in support of his position that exigent circumstances did not exist:

- The information from Snapchat did not suggest that MV-1
  was being held against her will or that she was being
  harmed.

- The possibility that MV-1 was engaged in sexual contact with an older adult male, because she was then sixteen years old and able to consent to sexual contact under Michigan law, did not give rise to probable cause of criminal activity and is not recognized by the law as conduct as presenting a threat of serious injury.

- The officers did not see or hear anything after they knocked on the hotel room door that suggested destruction of evidence, flight, or dangerous or harmful conduct.

- The officers did not run a criminal history check on Defendant after checking his license plates, so they had no information suggesting he had engaged in criminal conduct in the past.

Considering the evidence adduced at the hearing, none of it demonstrates the kinds of circumstances found to be exigent under Supreme Court or Sixth Circuit precedent. There is no proof of 1) hot pursuit of a fleeing felon, 2) imminent destruction of evidence, 3) the need to prevent a suspect's escape, or 4) a risk of danger to the police or others, as required in *Williams. See Williams,* 354 F.3d at 503 (citing *United Sates v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994)). Nor is there any evidence demonstrating the need to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury" to invoke the "emergency aid" exigency test under *Brigham City. Brigham City,* 547 U.S. at 403.

The gravamen of the exigent circumstances doctrine is the need for *immediate* action. To invoke this exception to the warrant requirement it

must be clear that "real immediate and serious consequences would certainly occur if a police officer postpones action to obtain a warrant." *See Williams*, 354 F.3d at 503 (internal citations omitted). Both in *Brigham City* and *Fisher*, the Supreme Court made it clear that in order to apply the emergency aid exigent circumstances exception, there must be a reasonable basis for the officers to believe that a person is in imminent danger of harm. As the Supreme Court explained in *Fisher*, the officers must have "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Fisher,* 558 U.S. at 47 (internal citations omitted). The kind of need to assist must be "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.*

In this case, the evidence shows that MV-1's parents and SPD had valid concerns about MV-1's well-being and legitimate desires to determine her whereabouts. But the pertinent question is whether the officers had an objectively reasonable basis for believing that MV-1 was seriously injured, threatened with serious injury, or in immediate need of emergency assistance. Is a 16-year-old unemancipated minor female "threatened with serious injury" or "in immediate need of emergency assistance" when there is reason to believe she is in a hotel room at 3:30 in the morning with a 45-year-old man from Indiana who is unknown to her parents?

While no parent could fail to recognize and legitimately fear the potential for psychological, emotional, or even possibly physical harm

these circumstances pose to a teenage daughter—even one who is just barely above the lawful age to give consent—the test the Court must apply is not whether there is a possibility of such harm but rather whether the evidence provided an objectively reasonable basis for the officers to conclude a person was seriously injured, threatened with serious injury, or in immediate need of emergency assistance. Only these imminent dangers are sufficient to permit the police to enter premises without a warrant. There is no evidence on this record of serious injury, a threat of serious injury, or an immediate need of emergency assistance. Consequently, the entry cannot be justified under the emergency aid exigent circumstances exception to the warrant requirement.

### B. Was the Warrantless Entry Justified Under the Community Caretaking Exception?

The government also argues that the community caretaking doctrine or exception justifies the officers' warrantless entry into Defendant's hotel room. Highlighting that the "ultimate touchtone of the Fourth Amendment is reasonableness," the government argues that SPD's warrantless entry into Defendant's hotel room was undertaken as part of their community caretaking duties, and was therefore justified. Dkt. 17, Pg. ID 67. The government relies heavily on *Cady* to argue that the community caretaking "exception" to the warrant requirement applies here.

### i.  *Cady v. Dombrowski and its Progeny*

In *Cady*, a Chicago police officer named Dombrowski crashed his car while driving in Wisconsin. *Cady,* 413 U.S. at 435-36. Wisconsin police officers—believing that Chicago officers carried their service weapons with them at all times—searched for a gun on Dombrowski's person, in the car's glove compartment, and in the front seat, but found nothing. *Id. at* 436. They towed the car to a local garage and took Dombrowski into custody for drunken driving. *Id.* A Wisconsin officer returned to the garage later that night to search the car again for Dombrowski's gun. *Id.* at 437. When the officer opened the locked trunk of the car, he discovered clothing and other items with blood on them. *Id.* at 437-38. When the police confronted Dombrowski with the evidence, he directed them to a body on his brother's farm. *Id.* at 438. Dombrowski was charged with murder, and the items discovered in the trunk of the car were admitted at trial as evidence. *See id.*

On appeal, the Supreme Court sustained the warrantless search of the trunk as a legitimate exercise of the police force's community caretaking function. The Court explained that the search was not conducted for evidence-gathering purposes, but rather for safety reasons: the car had been towed to a garage lot, leaving the gun inside accessible to vandals. *Id.* at 443, 448. Activities undertaken to assist those in danger and to safeguard property are integral to the officer's "community caretaking

functions." *Id.* at 441. Therefore, the warrantless search reflected a legitimate exercise of the police force's community caretaking function by ensuring the gun did not fall into the wrong hands and endanger the public. *See id.* Importantly, the Court's conclusion that the search was constitutional was premised on the Court's "previous recognition of the distinction between motor vehicles and dwelling places." *Id.* at 447.

Neither before nor after *Cady* has the Supreme Court held that the community caretaking doctrine justifies a warrantless entry into a home. Likewise, the Sixth Circuit has explicitly declined to extend the community caretaker exception to justify a warrantless entry into, or search of, a home. *See United States v. Washington,* 573 F.3d 279, 288-89 (6th Cir. 2009); *Williams*, 354 F.3d 497, 508 (6th Cir. 2003); cf. *Taylor,* 502 F.3d 452, 462 (6th Cir. 2007) (Aldrich, J., dissenting).

In *Williams,* the defendants' landlord, after receiving an unusually high water bill, entered their rental property to check for leaks. The landlord had only inspected the kitchen of the property before the sight of leaves strewn across the floor, the smell of something suspicious, and the lack of any light or furniture convinced her to call the DEA. *Id.* at 500. At the landlord's request, a DEA agent inspected the entire house for a water leak. *Id.* at 500-01. Though he located no water leaks, the agent did find a large amount of marijuana. *Id.* at 501. The Court refused to apply a community caretaking exception to justify the officers' warrantless entry and search because "the entry in this case cannot be said to have been

solely related to [the Agent's] community caretaking function." *Id.* at 508. The court also expressed "doubt that community caretaking will generally justify warrantless entries into private homes." *Id.*

*Washington* is similarly instructive. In *Washington*, a tenant in an apartment building had been arrested on drug paraphernalia charges and left his nephew in the apartment. *Washington,* 573 F.3d at 281. The landlord informed officers that non-residents frequently loitered in the hallways of the building, and requested they patrol the building and remove non-residents and trespassers. *Id.* A few days later, officers noticed individuals present in the tenant's apartment (while the tenant was in jail) and entered the apartment on the theory that those occupants were trespassing. *Id.* at 281-82. The officers searched the tenant's nephew and found a .357 revolver in his waist band and a crack pipe in his pocket. *Id.* at 282. After being charged as a felon in possession of a firearm, the defendant moved to suppress this evidence, arguing the warrantless search violated his Fourth Amendment rights. *Id.*

As alleged by the police in this case, the facts in *Washington* also involved an apartment building that was a dangerous environment plagued with drugs, "foot traffic and unsavory characters traveling to and from the unit," which was "frightening." *Id.* at 288. Nevertheless, the Court pointed out that the possibility of harm was not sufficient to justify a warrantless entry: "[w]hen people may have the capacity to harm oth-

ers, but are not engaged in an inherently dangerous activity, officers cannot lawfully dispense with the warrant requirement." *Id*. The Court observed that "the facts at best evidence the vague potential for harm to persons and property as opposed to imminent or ongoing harm" and also worried that "[t]o conclude that even when police cannot identify an ongoing injury to the community they may search homes without warrants would not merely go further than our previous cases, it would contradict Supreme Court precedent." *Id*. Even when exercising community caretaking authority, entering a home without a warrant should only be possible where the police could make a showing that "immediate and serious consequences" or "urgent or life-threatening" circumstances prevented them from getting a warrant. *Id*. at 289. Consequently, the Sixth Circuit in *Washington* held that "the community caretaker exception does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large." *Id*. at 289.[4]

Here, the government argues:

[The] community caretaking function applies because the officers did not enter the hotel room to investigate, interview or acquire evidence. To the contrary, the overriding concern was

_____

[4] While the parties in *Washington* did not appear to make the argument that the community caretaking exception can *per se* apply to justify a warrantless entry or search of a home, the Sixth Circuit's holding suggests that, absent some sort of exigent circumstance—of which there was none in that case—the community caretaking exception could not justify a warrantless entry or search of a home. *See id.*

the safety and security of MV-1. The primary purpose in entering the motel room was to ascertain whether MV-1 was safe, and not to gather additional evidence.

Dkt. 17, Pg. ID 71. This argument is not well taken for a number of reasons.

As an initial matter, the government advances competing reasons for the officers' warrantless entry into Defendant's hotel room. On the one hand, the government argues that the entry was only to check on the well-being of MV-1 and to conduct a wellness check. On the other hand, the government argues that the officers' entry was motivated in part by their concern that MV-1 was in immediate danger and that the Defendant was destroying evidence or attempting to escape. Dkt. 17, Pg. ID 77.

Although no evidence was presented at the suppression hearing that showed the Defendant was destroying evidence or attempting to escape, Officer Clark *did* admit on cross examination that his desire to enter Defendant's room was partly motivated by a suspicion that there was something illegal happening in the room between Defendant and MV-1. Importantly, the community caretaker exception does not apply unless the officers' actions in question are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" or if they are taken with any traditional law enforcement purpose. *See, e.g., Cady,* 412 U.S. at 441; *Williams*, 354 F.3d at 508; *United States v. Lewis*, 869 F.3d 460, 463 (6th Cir. 2017).

Second, the government offers no authority supporting the view that the community caretaker exception applies to justify the warrantless entry into a home. As explained above, neither the Supreme Court nor the Sixth Circuit has ever extended the community caretaker exception beyond automobiles—except when considered together with exigent circumstances. A majority of the other circuits is in accord.

Third, Defendant argues that the circumstances officers seek to address while performing their caretaking function must present an immediate and serious harm that is certain rather than speculative. *See* Dkt. 18, Pg. IDs 88-89. Indeed, governing case law in the Sixth Circuit suggests that in order to avail themselves of the community caretaking exception, officers must be faced with an immediate need to act, *even assuming* it applies to the warrantless entry of a home (which this circuit has never held). When rejecting the application of the community caretaking exception to justify the warrantless entry and search of a home in *Williams*, the court focused in part on the fact that, unlike other cases where the community caretaker exception applied, the "threat" or "danger" sought to be addressed by entering the apartment was speculative rather than certain. *Williams*, 354 F.3d at 508.

### ii. *United States v. Rohrig*

The government also relies on *United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir. 1996) to support the proposition that the community caretaking exception applies to SPD's warrantless entry into Defendants

hotel room in this case.[5] In *Rohrig*, police officers responded to early morning complaints about excessive noise at the defendant's home. *Id. at* 1519. As the police approached, they could hear loud music from a block away. Soon after the officers arrived, a group of neighbors approached them to complain about the noise. *Id.* After arriving at the house, the officers banged on the front door and tapped on the windows, but no one answered the door. Two officers eventually opened an unlocked screen door and entered the home. They found the stereo and turned down the volume. In the same room, they found Rohrig intoxicated and asleep on the floor. *Id.* While in the home, the officers also encountered "wall-to-wall" marijuana plants.

After finding that "none of the traditionally recognized exigent circumstances is squarely presented under the facts" of the case before it, the court "fashioned a new exigency that justifies warrantless entry" culled from the Supreme Court's Fourth Amendment jurisprudence:

> First, we must ask whether the Government has demonstrated a need for immediate action that would have been defeated if the . . . police officers had taken the time to secure a warrant. Next, we must identify the governmental interest being served by the officers' entry into [the] home, and ask whether that interest is sufficiently important to justify a warrantless entry. Finally, we must weigh this governmental

---

[5] As will be discussed below, *Rohrig* ultimately approves a warrantless search of a home under the exigent circumstances exception, rather than the community caretaking exception. However, *Rohrig* does reference the significance of the community caretaking function, and it is discussed by the government for that reason, so its impact will be discussed under this section.

interest against Defendant's interest in maintaining the privacy of his home, and ask whether Defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy.

*Rohrig*, 98 F.3d at 1518.[6]

To the first prong, the *Rohrig* court found that the very late hour, the blasting music audible from a least a block away, and the "irate group of . . . neighbors" outside demonstrated that time was of the essence. *Id.* at 1522.

In considering the second prong, the government interest involved, the court noted that Supreme Court precedent instructs that the weight of a government interest should be measured in part by the severity of the offense being investigated. *Id.* (citing *Welsh*, 466 U.S. at 742-43, 753-54). In *Rohrig*, the relevant statute at issue was a noise ordinance, which the court noted might suggest a diminished government interest according to *Welsh*. However, the court found that the *Welsh* analysis "has less relevance as one moves away from traditional law enforcement functions and towards what the Supreme Court has referred to as community caretaking functions." *Rohrig*, 98 F.3d at 1521 (internal citations omitted). In other words, the second prong of the exigency test created by *Rohrig* (re-

---

[6] *Rohrig* thus reflects the court fashioning a three-prong modified exigent circumstances test, reflecting an analysis of whether: 1) immediate government action is required, 2) the government interest at stake, if any, is sufficiently important to justify a warrantless entry, and 3) the citizen's conduct somehow diminished his or her normal reasonable expectation of privacy.

quiring the court to give weight to the importance of the government interest at stake) is *less important* when the police officers are acting in a community caretaking role, compared to when police are acting within the scope of their traditional law enforcement duties. *Id.* The court found that the officers were not aiming to track down a suspected violator of the local ordinance. *Id.* at 1521. Instead, by entering the residence "for the limited purpose of locating and abating a nuisance," the officers sought to restore the neighbors' peaceful enjoyment of their homes and neighborhood. *Id.* Given the "importance of preserving our communities," the interest "is not so insignificant that it can never serve as a justification for warrantless entry into a home." *Id.*

To the third prong, the court found that the defendant's expectation of privacy was diminished because he was "projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *Id.* at 1522.

### 1. Applying *Rohrig's* Modified Exigent Circumstances Test to These Facts

The government argues that under the modified exigent circumstances test fashioned by *Rohrig*, the officers' warrantless entry into Defendant's room was justified. To the first prong, the immediate need for government action, the government argues:

> Even more serious than the officers in *Rohrig*, SPD was responding to not a nuisance, but a threat of danger, and the safety of a child. The situation required "immediate government action"; that is, after meeting MV-1's frightened parents

> in the motel parking lot, verifying that "Robert" from Indiana
> was in room #103, and banging on the door, only to hear rus-
> tling inside the dark room, no choice remained but to be swift
> in their actions.

Dkt. 17, Pg. ID 70. As discussed above, the record does not support a claim that the officers heard noises that would suggest activity of any kind inside the room. First, as stated, there was no "rustling." No evidence was presented that anyone was injured, threatened to be injured or in need of medical treatment. While the government asserts there was a "need for immediate action," the evidence demonstrated only a concern to find out whether MV-1 was in the room and what her condition was. This is not the same as a need to respond to an imminent and ongoing harm, which is what *Rohrig* and *Washington* say must be shown.

Second, the possibility that MV-1 was in the room engaging in consensual sexual activity with a 45-year-old man—however panic-inducing to her parents and concerning to law enforcement officials such a prospect may understandably be—is not a situation that the law treats as creating an objectively reasonable basis to believe that MV-1 was in danger, "subject to a threat of danger," or in immediate need of protection from harm. *See United States v. Christy*, 785 F.Supp.2d 1004, 1041-42 (D.N.M. 2011) (finding that officers lacked an objectively reasonable basis to believe that a 16-year-old girl who had gone missing and who officers believed to be in a sexual relationship with a 57-year-old man was in threat of physical danger when state law allowed a 16-year-old girl to

consent to sexual relations, and when the officers had no basis to believe the minor was forced or coerced into having sexual contact with the other person); *see also* Mich. Comp. Laws § 750.520b.

In assessing the "need for immediate action," it is understandable how the government could argue that the "need" to lower the volume of a blaring stereo disturbing the peace of a neighborhood is less important than the need parents feel to ensure the return of their minor daughter from the hotel room of a strange older man. But the difference for purposes of applying the test in *Rohrig* is that the nuisance of loud noise was immediate, serious, demonstrable and ongoing, while the fears of the parents and concerns of the officers—though completely understandable—were not supported by any objectively reasonable basis that "real immediate and serious consequences would certainly occur" in the absence of immediate action. In short, it was not clear that "no choice remained but" to execute a warrantless entry into Defendant's room. *Rohrig* concerned an "immediate, ongoing, and highly objectionable nuisance" while here there was no proof of an ongoing injury or immediately harmful conduct. Thus, the facts of this case fail to establish the first prong of *Rohrig's* modified exigent circumstances test.

Regarding the second prong, whether the governmental interest at stake is sufficiently compelling to justify a warrantless entry, the government argues that SPD has an interest in "assisting parents whose minor children have gone missing with a middle aged man who is at a motel

known for sex trafficking. These parents (and SPD) could not possibly know if this man was armed, dangerous, mentally ill, a sex trafficker, a drug dealer, or any host of things." Dkt. 17, Pg. IDs 70-71.

*Rohrig* explained that Supreme Court precedent instructs the weight of a government interest should be measured in part by the severity of the offense being investigated. *Rohrig*, 98 F.3d at 1521. Here, the government espouses somewhat contradictory positions. On the one hand, the government maintains the officers were conducting a welfare check, meaning that they were not investigating criminal activity when they entered Defendant's hotel room without a warrant. On the other hand, they assert a strong government interest arising from an arguably severe criminal offense, that Defendant may have been armed, dangerous, mentally ill, a sex trafficker, a drug dealer, or "any host of thing." Dkt. 17 Pg. IDs 70-71. While such a possibility existed, the record evinces no facts supporting a reasonable or probable belief that such criminal activity was taking place. The officers might have gathered more evidence about any potential threat by running a criminal history check on Defendant, but Officer Clark testified that he did not do so after obtaining the Defendant's identity from his license plate. But the mere fact that the hotel was known to the police as a location where prostitution, drug trafficking, or violent crime had been discovered in the past does not permit a reasonable inference that Defendant was then engaged in such activity. The weight of the government's interest, based on the evidence,

arises from the legitimate interests of MV-1's parents and the officers in ascertaining her location and determining whether she was safe. The question is whether this interest justifies a warrantless entry.

The *Rohrig* test also suggests that the need for a strong governmental interest (such as a serious criminal offense) diminishes "as one moves away from traditional law enforcement functions" and towards functions classified as community caretaking functions. *Rohrig*, 98 F.3d 1521. In that case, the governmental interest in immediately abating an ongoing nuisance by quelling a loud and disruptive noise in a residential neighborhood was sufficiently compelling to meet the second prong. There, the court had already found the facts sufficient to meet the first prong of the test: the need to take immediate action. While the *Rohrig* court recognized that the governmental interest factor was weaker where the offense was a noise ordinance, it found that there was less of a need for a strong governmental interest when the police are carrying out their community care taking function and the need for immediate action was manifest.

Unlike in *Rohrig*, where the nuisance was ongoing and plainly evident, the circumstances confronted by the SPD did not support a reasonable conclusion that MV-1 was facing immediate harm. Because MV-1 was lawfully able to consent to sexual relations, evidence of her presence in a hotel room with a man—in and of itself—is insufficient to establish a threat of immediate harm. Even if the officers were acting solely as

community caretakers, there must be a public safety concern that presents an immediate threat. No "community caretaking" function is implicated where the police seek to perform a welfare check on a minor who the officers have no articulable reason to believe is in danger or subject to illegal or illicit sexual behavior. *See Christy*, 785 F.Supp.2d at 1004.

The third prong of the *Rohrig* test requires weighing the governmental interest against Defendant's interest in maintaining the privacy of his home, and considering whether Defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy.

The government suggests that because Defendant was in a hotel room rather than his residence, he was subject to a lesser degree of Fourth Amendment protection. Dkt. 17, Pg. ID 71. This position is unsustainable. *See, e.g., Riley*, 858 F.3d at 1018 ("[T]he Fourth Amendment's full complement of protections also applies to hotel rooms.") (internal citations omitted).

On the question of whether the Defendant's conduct somehow diminished the reasonableness of his expectation of privacy, the government contends that it was "certainly reasonably foreseeable that law enforcement will probably intrude on one's privacy where, as here, they knock loudly and announce their presence for close to fifteen minutes, knowing someone is likely inside with a child—without parental permission—and is refusing to answer the door." Dkt. 17, Pg. ID 71. This argument misreads *Rohrig*, because the question is whether the *Defendant's*

*conduct* is such that it diminishes his reasonable expectation of privacy—as when one blares a sound-system at full-blast in a crowded neighborhood in the middle of the night. The question is not whether one might reasonably expect the police to bust in after they have been knocking for 15 minutes (and that person wishes not to be discovered because he may be doing something illegal). One does not engage in conduct diminishing one's reasonable expectation of privacy by failing to answer the door when the police knock and seek admittance.

In *Kentucky v. King*, the Supreme Court explained that when a law enforcement officer without a search warrant knocks on a door, he or she does "no more than any private citizen might do [and] whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." 563 U.S. 452, 469 (2011). The government may be correct that in today's world it is reasonably foreseeable that one's privacy might be intruded upon if the police knock repeatedly and an occupant fails to answer. But that is more a commentary on current public expectations regarding police behavior than it is a proper statement of Fourth Amendment law. The people have a right to be "secure in . . . their houses . . . against unreasonable searches." U.S. Const. amend IV. This fundamental guarantee of liberty supports a different understanding of what is "reasonably foreseeable" regarding privacy than what the government argues: citizens should be justified in expecting that the police will *not*

normally enter their homes without search warrants, even if they knock repeatedly and no one answers. The Court will not countenance the view that Defendant somehow invited the intrusion by failing to answer the door.

To summarize, in applying the *Rohrig* test, 1) there was no showing of any need for immediate action, such as any proof of harm or emergency; 2) the interest served in conducting a welfare check was not shown to be sufficiently important to overcome the presumption that a warrant is required to search a residence; and 3) the privacy interest in a residence is not outweighed by the government's interest in performing a welfare check (when there is no evidence of imminent danger) and the Defendant did nothing to diminish his expectation of privacy. The *Rohrig* exigent circumstances test does not justify a warrantless entry.

### 2. *Rohrig* Has Limited Application

The government's reliance on *Rohrig* in this case is inappropriate for two additional reasons. First, to the extent the government argues *Rohrig* stands for the proposition that the community caretaker exception may permit a warrantless search of a home, that argument is misplaced. *Rohrig* expanded the breadth of the exigent circumstances doctrine; it did not hold that the community caretaking exception applies to searches of homes. Although the court referenced the community caretaking doctrine, it did so as part of crafting a modified exigent circumstance test with narrow application. In *Rohrig*, police officers were acting

within the scope of their community caretaker duties and not investigating a crime, and this fact affected how the Court balanced the governmental interest against the need for a warrantless entry, but the exception that permitted the entry was an expanded exigent circumstances test, not the community caretaker exception. To the extent the government reads *Rohrig* as establishing an independent community caretaking exception that allows the warrantless entry into a home, this reading is incorrect.

Second, *Rohrig* was intended as a narrow, fact-specific holding:

> We wish to emphasize the fact-specific nature of [our] holding. By this decision, we do not mean to fashion a broad 'nuisance abatement' exception to the general rule that warrantless entries into private homes are presumptively unreasonable. We simply find that, in some cases, it would serve no Fourth Amendment purpose to require police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance, and we conclude that this is just such a case.

*Rohrig*, 98 F.3d at 1525 n. 11.

The Sixth Circuit has emphasized *Rohrig*'s limited applicability. In *Williams*, the Sixth Circuit explained it was "adher[ing] to the panel's suggestion that its decision should not be extended beyond the facts of that case" and therefore found *Rohrig* not to be controlling. *Williams,* 354 F.3d at 507. The court explained:

> *Rohrig* involved an immediate, ongoing, and highly objectionable nuisance, while this case involves no nuisance at all. The possible water leak in this case posed no threat or nuisance to any member of the public. Rather, the agents in this case were

concerned with protecting one woman while she abated potential damage to her carpet. Despite … speculative concerns, there is no immediacy in this case. *Id.*

The *Williams* court further distinguished *Rohrig*, because there the court found the officers were performing a community caretaking function, while in *Williams*, the officers were not solely motivated by community caretaking functions. *Id.* at 508. Similarly here, while the officers who went to the Marvin's Garden Inn were primarily motivated to conduct a welfare check of MV-1, they were also concerned that something illegal may be going on. By its own terms, *Rohrig* was limited to the narrow scope of its facts; it does not apply here.

### C. <u>May the Government Use Evidence Seized After the Officers' Illegal Entry?</u>

Because SPD's warrantless entry into Defendant's hotel room was not justified by any of the limited exceptions to the warrant requirement, it was per se unreasonable and violated the Fourth Amendment. This raises the question of whether the evidence subsequently obtained by law enforcement must be suppressed.[7]

---

[7] In addressing this question, it is worth considering what else the police could have done. There were several alternatives. First, they could have investigated further to determine whether the situation required immediate action. If they were dealing with a person who was "dangerous, mentally ill, a sex trafficker, a drug dealer, or any host of things," as suggested by the government, a criminal history report might have revealed that. Second, if the officers had facts suggesting evidence of a crime would be in the room, they could have attempted to obtain a warrant. (To the extent the officers believed they could not get a warrant, the entry and search becomes more questionable.) Third, the officers could have persistently continued to knock on Defendant's door until either he or MV-1 answered it. Or, they could have had MV-1's parents knock on the

Defendant moves to suppress "[t]he evidence obtained from the hotel room and the subsequent search of [his] electronic devices." Dkt. 14, Pg. ID 2. Defendant maintains that this evidence reflects fruit of the illegal entry and search of the room. *See* Dkt. 14, Pg. ID 2 (citing *Wong Sun,* 371 U.S. at 484).

The government opposes suppression on two bases. First, the government argues that even if the initial entry was illegal, Defendant's subsequent consent to a search of his hotel room and the statements he gave to the officers were acts of free will sufficient to purge the taint of the illegal entry. *See* Dkt. 17, Pg. ID 78. Second, the government argues that suppression is not warranted where police conduct is not deliberate, reckless, or grossly negligent and that the officers' conduct here meets that standard. *See* Dkt. 17, Pg. IDs 81-83. The court addresses both issues below.

### i. Consent

When consent is given after an illegal entry has occurred, the consent is invalid and all items seized during the search are suppressed "unless the taint of the initial entry has been dissipated before the 'consents'

---

door, and call for her to come out. Fourth, the officers could have continued calling MV-1's cell phone, or had her parents continue to call her while positioned outside of Defendant's hotel room. The sound of a ringing cell phone would have confirmed whether MV-1 was there. Finally, the officers could have simply parked a squad car next to Defendant's car and waited for Defendant or MV-1 to exit the room. These options do not offer the visceral satisfaction and swift certainty of entering the room suddenly with the pass-key, but neither do they run afoul of the Fourth Amendment's warrant requirement.

to search were given." *United States v. Buchanan*, 904 F.3d 349, 356 (6th Cir. 1990) (citing *United States v. Vasquez*, 638 F.2d 507, 527 (2nd Cir. 1980), *cert denied*, 450 U.S. 970, 101 S.Ct. 1490, L.Ed.2d 620 (1981)). Consent that is given following a Fourth Amendment violation must be both voluntary and sufficiently attenuated from the initial illegal act. *See United States v. Lopez-Arias*, 344, F.3d 623, 629-30 (6th Cir 2003).

A taint has been effectively dissipated if some significant intervening time, space, or event occurs. *Id.; Brown v. Illinois*, 422 U.S. 590, 604 (1975). The relevant factors include temporal proximity of the illegal act and the consent, whether *Miranda* warnings were given, the presence of intervening circumstances, and the purpose and flagrancy of official misconduct. *See Lopez-Arias*, 344 F.3d at 630.

Ultimately, the government bears the burden of showing by a preponderance of the evidence that the defendant's consent was sufficiently an act of free will to purge the taint of the unlawful invasion. *Buchanan*, 904 F.2d at 356; *Brown,* 422 U.S. at 599.

Officer Clark testified that after entering the room, he heard a noise in the bathroom and asked Defendant if anyone else was there. Defendant stated that someone was in the bathroom, and Officer Clark proceeded to the bathroom while Sergeant Simerley stood next to Gordon who was sitting on the hotel room bed. Officer Simerley testified that Gordon stated he would be 100% cooperative with the police. Simerley

also testified that Defendant was continually reaching for his phone around this point in time, and that he ordered him to stop doing so.

As MV-1 was being escorted out of the hotel room by the officers, she asked Officer Clark to retrieve her boots. Officer Clark testified that while doing so, he observed in MV-1's purse a photograph of Defendant and MV-1 nude. Officer Clark showed the picture to Sergeant Simerley, who then gave Defendant *Miranda* warnings and asked Gordon for consent to search the hotel room. Officer Simerley testified that only about three to five minutes passed between the time of the officers' initial entry until the moment when Gordon was *Mirandized* and gave consent to the officers to search the hotel room.

The officers' search yielded several electronic devices and three photographs of MV-1 and Defendant. Sergeant Simerley asked Defendant whether or not there was anything inappropriate on his phone, and Defendant responded that MV-1 had sent him naked pictures of herself. When questioned by the Court, Sergeant Simerley testified that he advised Defendant the officers were going to seize his electronic devices pursuant to an investigation. Sergeant Simerley also testified that Defendant provided the access codes to his iPhone and iPad after being asked for them by Officer Hendricks. The officers seized Gordon's electronic devices at the scene. But the items were not searched until after they obtained a warrant to do so.

The Court must determine whether a preponderance of the evidence shows that Defendant's consent to search his hotel room was an act of free will untainted by the unlawful nature of the warrantless entry. After entering Defendant's room, Sergeant Simerley stood next to Defendant and at one point ordered Defendant to stop reaching for his cell phone. While Sergeant Simerley spoke with Defendant, at least one officer (Clark) moved about inside the hotel room: to the bathroom to get MV-1 and beside and underneath the bed to retrieve MV-1's boots. Furthermore, Sergeant Simerley questioned Defendant about "what was going on" in the hotel room between he and MV-1. These interactions with Defendant occurred during the approximately three to five minutes between the officers' illegal entry and Defendant being *Mirandized* and giving consent to search his hotel room.

The Court finds that the approximately three-to-five minute period that elapsed between the officers' illegal entry and their obtaining of consent—in light of its brevity and the lack of any intervening event that could have attenuated the illegal conduct from Defendant's decision—was insufficient to dissipate the taint of the officers' unlawful entry. *See, e.g., Buchanan*, 904 F.2d 365 (holding the taint of the illegal seizure was not purged when only approximately one hour passed between the illegal entry and the consent to search); *Brown*, 422 U.S. at 604 (separation of less than two hours between an illegal arrest and a voluntary statement

was insufficient to break the causal chain between the two when no intervening event of significance had occurred); *United States v. Richardson,* 949 F.2d 851, 859 (6th Cir. 1991) (finding evidence discovered pursuant to a consent to search was inadmissible because the consent to search was given twenty minutes into an illegal arrest); *United States v. Damrah*, 322 F. Supp. 2d 892, 900 (N.D. Ohio 2004) ("The agents' unlawful presence had lasted less than ten minutes before Nasreen Damrah gave her consent to search the home. Such a short period is insufficient to end the influence of the Agents' improper entry . . . .").

The Court likewise rejects the argument that the giving of *Miranda* warnings to Defendant was sufficient to dissipate the taint of the illegal entry that occurred just minutes before. The Supreme Court has held that *Miranda* warnings by themselves are not always sufficient to purge the taint of a Fourth Amendment violation. *See Brown*, 422 U.S. at 603. The record contains no evidence of any significant period of time or any material intervening event that occurred between the officers' unlawful entry and Defendant being given *Miranda* warnings, or Defendant giving the officers consent to search his hotel room. Because the preponderance of the evidence weighs in favor of finding that nothing occurred to attenuate the taint of the illegal entry from Defendant's consent and *Miranda* waiver, neither Defendant's consent nor the waiver are sufficient to prevent suppression of the evidence.

### ii. Were the Officers' Actions Deliberate, Reckless, or Grossly Negligent?

The government also argues that suppression is not warranted because the SPD officers' conduct was not deliberate, reckless, or grossly negligent. *See* Dkt. 17, Pg. IDs 81-83.

The essence of the exclusionary rule is to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligent." *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) (citing *Herring*, 555 U.S. at 141, 144). The exclusionary rule does *not* create an individual right to suppress evidence whenever a citizen's Fourth Amendment rights are violated. It does not necessarily follow that evidence seized in violation of the Fourth Amendment will always be suppressed or excluded. *See Herring*, 555 U.S. at 140. Indeed, the Sixth Circuit has found that "the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *Master*, 614 F.3d at 242.

The Supreme Court has effectively created a balancing test to determine when evidence obtained by way of a Fourth Amendment violation should be excluded from use at trial. In order for a court to suppress evidence obtained in conjunction with a Fourth Amendment violation, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Ultimately, the benefits of deterrence must outweigh the costs. *Id.* at 141.

Considering the record before the Court, the officers' conduct was sufficiently deliberate. This is not a case in which officers relied in good faith on the mistake of a magistrate or judge, *see United States v. Leon,* 468 U.S. 897, 920-21 (1984), or an erroneous entry in a warrant database. *See Herring,* 555 U.S. at 146. To the contrary, the officers here took purposeful and independent actions: they deliberately chose to enter Defendant's private hotel room without a warrant and in a scenario lacking exigent circumstances that would justify a warrantless entry. Instead, the officers relied upon their duties as "community caretakers" and entered Defendant's room to conduct a "welfare check" to address the concerns of parents who believed that their minor (but consenting-age) daughter was with an older man they did not know.

The record also supports the conclusion that the officers' conduct is sufficiently culpable to warrant suppression. While the government relies heavily on the community caretaker doctrine, the Sixth Circuit has not found that doctrine to provide an exception to the Fourth Amendment warrant requirement in these circumstances. Moreover, the government has failed to show that any of the recognized exceptions to the warrant requirement for exigent circumstances justified the entry in this case. In both respects, and critically so, the government has failed to show that there existed an immediate need for the officers to execute a warrantless entry. There was no evidence of harm, threat of harm, injury requiring

medical attention, danger, emergency, or ongoing public nuisance. Furthermore, for purposes of the community caretaker doctrine, the record shows that the officers were motivated to enter Defendant's hotel room in part based on a presumption that criminal activity may be going on inside. *See Williams*, 354 F.3d at 508 (explaining actions taken as community caretakers must be totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute). Thus, the officers' acts are sufficiently culpable because a reasonably well-trained officer would have known that the warrantless entry executed in this case was illegal in light of all the circumstances. *See Herring*, 555 U.S. at 145.

Upon careful review of this record, the Court concludes that the officers' conduct was deliberate enough that applying the exclusionary rule will act as a deterrent. It is difficult to say with quite as much certainty that the officers' culpability was so significant that the price paid by the justice system in excluding the evidence is worth the gain from such deterrence. The price of losing evidence of alleged child pornography manufacturing is a high one, and the officers' culpability in proceeding without a warrant is somewhat mitigated by their good intentions in seeking to assist concerned parents. However, the Court must measure that cost against the inestimable value of maintaining a society that honors the Fourth Amendment. Weighing these factors, exclusion is the proper remedy in light of the violation.

## V.    Conclusion

For the foregoing reasons, the Court finds that the warrantless entry into Defendant's hotel room violated his Fourth Amendment rights and that the taint of that unlawful entry had not dissipated when Defendant allegedly consented the search of his hotel room. Consequently, Defendant's motion to suppress and to exclude all evidence obtained as a result of the officers' illegal search is **GRANTED**.

**SO ORDERED.**

Dated: April 23, 2018      s/Terrence G. Berg
                           TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE


### Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on April 23, 2018.

                           s/A. Chubb
                           Case Manager